RECEIVED

OCT - 3 2013

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

B.B., A MINOR CHILD, B/N/F                    CIVIL ACTION NO. 11-1451
CARLOS BEARD AND TAMMYE BEARD

-vs-                                          JUDGE DRELL

CATAHOULA PARISH SCHOOL DISTRICT       MAGISTRATE JUDGE KIRK

RULING

Before the Court are cross Motions for Summary Judgment filed by

Plaintiffs (Doc. 28) and Defendant (Doc. 29). All responses have been filed, oral

argument has been held, and the matters are ready for disposition. For the

following reasons, both motions will be GRANTED IN PART and DENIED IN PART

as set forth herein.

## I. Background

The facts of this case are not disputed.  (Doc. 42 at 3).  B.B. was born on

May 23, 2003 and is currently ten years of age. (Doc. 27 at 15).  He was diagnosed

with Downs Syndrome at birth, despite a normal pregnancy. (Doc. 27-8 at 137).  It

is uncontested that B.B. qualifies as a student to receive special education under

the Individuals with Disabilities Education Improvement Act ("IDEA")[1] secondary

to developmental delay.  (Doc. 27-8 at 160).  The Louisiana Board of Elementary

---

[1]    The Individuals with Disabilities Education Act, commonly referred to as IDEA, was
amended in 2004 with the Individuals with Disabilities Education Improvement Act (IDEIA).
Despite this amendment, the legislation is still referred to as "IDEA" or "IDEA 2004."

1

and Secondary Education defines developmental delay as "a disability in which students/children, ages three through eight, are identified as experiencing developmental delays in one or more of the following areas: physical development, cognitive development, communication development, social or emotional development or adaptive development."  La. Admin Code. tit. 28, pt. CI, § 705 (A).

Plaintiffs allege that B.B. resides with his parents in Catahoula Parish, Louisiana in the Catahoula Parish School District.  (Doc. 1 at 2).  Defendant Catahoula Parish School Board (improperly denominated as "Catahoula Parish School District") (hereinafter "CPSB") first identified B.B. as a child eligible for special education and conducted an Initial Individual Evaluation when he was 3 years old.  (Doc. 27-8 at 150).  Mr. and Mrs. Beard originally chose for B.B. to receive only speech services from CPSB in the 2006-2007 school year.  (Id. at 75–76).  B.B. attended Jonesville Elementary School for the next four years (preschool, kindergarten,1st and 2nd grades) in a self-contained special education classroom.  (Doc. 27-8 at 75; Doc. 27-11 at 18–20, 101).

The basis for Plaintiffs' complaint first arose in October 2010 of B.B.'s second grade year when his parents properly requested an Individualized Education Program ("IEP") meeting to discuss transportation arrangements for B.B. to ride the regular education school bus instead of the special education school bus.  (Doc. 27-5 at 83; Doc. 27-10 at 134; Doc. 16-4 at 6).  On October 21, 2010, the IEP team determined that B.B.'s inappropriate behaviors at school prevented B.B. from being able to ride the regular education bus.  (Doc. 27-5 at

93).  The parents disagreed with this decision and their relationship with CPSB became increasingly strained as they alleged incidents of physical abuse, insufficient training, and deceit resulting in trust issues with the school district. (Doc. 27-10 at 183–84, 189).

Plaintiffs filed for a Due Process Hearing with an Administrative Law Judge ("ALJ") against CPSB on January 31, 2011. (Doc. 1 at 10; Doc. 27-4 at 9–18).  The request for a Due Process Hearing was then revised and refiled on February 2, 2011.  (Doc. 1 at 10; Doc. 27-4 at 19–30).  There, Plaintiffs contended that CPSB failed to provide B.B. a free appropriate public education ("FAPE") from February 2, 2010 to February 2, 2011.  (Doc. 28 at 13).

A hearing was conducted by an ALJ from March 28, 2011 to March 31, 2011.  (Doc. 16-4 at 1).  The ALJ issued a twenty-three page decision and order on May 26, 2011 (Id. at 1–23), and found that CPSB failed to provide the least restrictive transportation environment, but that Mr. and Mrs. Beard had failed to prove that B.B. was denied FAPE.  (Id. at 12–23).

Plaintiffs filed a complaint in this Court to appeal the ALJ's decision on August 10, 2011.  (Doc. 1).  Plaintiffs now contend the ALJ "erroneously applied the law to the facts and failed to analyze the facts as they related to the allegations that were actually made in the request for due process."  (Id. at 11). In their Motion for Summary Judgment (Doc. 28), Plaintiffs specify two primary contentions: (1)the facts support an order for transportation training and support related to B.B.'s bus ride; and (2) the facts support the conclusion that CPSB failed to provide B.B. with a free appropriate public education between February 2, 2010

and February 2, 2011.  (Doc. 28 at 9, 13).  In their Motion for Summary Judgment (Doc. 29), Defendant argues Plaintiffs failed to meet their burden of proof that CPSB did not provide FAPE to B.B.  (Doc. 29-1 at 9).

## II. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983).  It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, and (2) the movant is entitled to judgment as a matter of law.

## III. Standard of Review

When reviewing the ALJ's decision, the district court shall receive the record of the administrative proceedings, hear additional evidence at the request of a party, and grant such relief as the court deems appropriate, basing its decision on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C).  While the district court should give the ALJ's findings "due weight," those findings are not conclusive.  Teague Indep. Sch. Dist. v. Todd L., 999 F.2d 127, 131 (5th Cir. 1993).  The court "must ultimately reach an independent decision based on a preponderance of evidence."  Klein Indep. Sch. Dist. v. Hovem, 690 F.3d 390, 394

4

(5th Cir. 2012).  Thus, the district court's review of the ALJ's decision is "virtually

*de novo*."  Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 252

(5th Cir. 1997).

      Although review is *de novo,* "courts must be careful to avoid imposing their

view of preferable educational methods upon the States."  Bd. of Educ. of

Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 207

(1982).  "The role of the judiciary is not to second-guess the decisions of school

officials or to substitute their plans for the education of disabled students with the

court's."  R.H. v. Plano Indep. Sch. Dist., 607 F.3d 1003, 1010 (5th Cir. 2010), citing

Flour Bluff Indep. Sch. Dist. v. Katherine M., 91 F.3d 689, 693 (5th Cir. 1996).

Courts do not have the "specialized knowledge and experience" necessary to

resolve "persistent and difficult questions of educational policy."  San Antonio

Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42 (1973).  The sole question is whether

the school officials complied with IDEA.  R.H., 607 F.3d at 1010.  Since courts lack

this expertise, "the Court is cognizant that the close scrutiny warranted by *de*

*novo* review should be tempered by the realization that decisions made by those

'in the trenches' of educational service should not be casually disregarded."

Jonathan G. By & Through Charlie Joe G. v. Caddo Parish Sch. Bd., 875 F. Supp.

352, 359 (W.D. La. 1994).

      For cases brought under IDEA, with no new evidence presented to the

court, a Motion for Summary Judgment simply becomes "the procedural vehicle

for asking [this Court] to decide the case on the basis of the administrative

record." El Paso Indep. Sch. Dist. v. Richard R., 567 F. Supp. 2d 918, 927 (W.D.

Tex. 2008), citing Heather S. v. State of Wis., 125 F.3d 1045, 1052 (7th Cir. 1997).

IDEA "creates a presumption in favor of the educational plan designed by

the IEP." Salley v. St. Tammany Parish Sch. Bd., 57 F.3d 458, 467 (5th Cir. 1995).

The party attacking the plan bears the burden of proof and must show that the

IEP and resulting placement are not compliant with IDEA.  Adam J. v. Keller

Indep. Sch. Dist., 328 F.3d 804, 808 (5th Cir. 2003).

### IV.  Transportation

Plaintiffs contend that by denying B.B. the opportunity to ride the regular

education bus, CPSB did not provide B.B. with the least restrictive transportation

environment.  (Doc. 28 at 9).  Although the ALJ found that CPSB indeed failed to

provide B.B. with the least restrictive transportation environment and that B.B.

could ride the general education bus with a "bus buddy," Plaintiffs argue B.B. did

not receive the training and support essential to B.B.'s regular education bus ride.

(Doc. 16-4 at 22; Doc. 28 at 9).

**Fall 2010**

The conflict began in October 2010 when the Plaintiffs requested an IEP

meeting to discuss the possibility that B.B. could ride the regular education bus

instead of the special education bus and to address B.B.'s safety on the bus.  (Doc.

27-5 at 83; Doc. 27-10 at 134; Doc. 16-4 at 6).  In the fall of 2010, B.B.'s nondisabled

nephew, N.B., lived in the same home with B.B. and rode the regular education

bus from the home to Jonesville Elementary School every day.  (Doc. 27-10 at

69–74).  Thus, at that time, the regular education bus already stopped at B.B.'s

6

residence and transported students to Jonesville Elementary. (Id. at 69–70). In a letter dated October 15, 2010, Plaintiffs requested, through counsel, for N.B. to serve as B.B.'s "bus buddy" on the regular education school bus. (Doc. 27-7 at 13–15). Plaintiffs also requested that Kernie King, the driver of the regular education bus that N.B. rides, attend the IEP meeting to discuss preliminary training for B.B. and his "bus buddy", including practice loading the bus, unloading the bus, and sitting together. (Id. at 14). Plaintiffs stated: "[t]hese types of training opportunities are significant for the anticipated success of the plan yet cost little to nothing to implement." (Id.). The ALJ made a finding, and both parties stipulated, that B.B. has never ridden the regular education bus. (Doc. 42 at 3).

Plaintiffs allege CPSB notified Plaintiffs' counsel by phone that legal counsel for CPSB would be present for the October 21, 2010 IEP meeting. (Doc. 1 at 7; Doc. 27-4 at 3–4). Plaintiffs, through their lawyer, wrote a letter dated October 19, 2010 to CPSB's counsel objecting to the presence of CPSB's attorney at the IEP meeting. (Doc. 27-7 at 3–4). Plaintiffs' lawyer also requested, in the same letter, any education records "pertaining to either [B.B. or N.B.] that IEP team members intend to discuss during [the October 21, 2010] IEP meeting in accordance with 34 C.F.R. § 300.613(b)" before the IEP meeting. (Id. at 4).

An IEP meeting was held on October 21, 2010 and all necessary IEP team members were present at that time, including a regular education teacher. (Doc. 27-4 at 61). The ALJ observed that prior to the October 21, 2010 IEP meeting, B.B.'s behavior on the bus had not been discussed in any IEP meeting. (Doc. 16-4

7

at 7; Doc 27-5 at 72, 102; Doc. 27-10 at 152, 159–60, 166–68, 255).  Furthermore, the ALJ found that B.B. had never received any disciplinary referral for his bus behaviors and consistently received "Bear Pride Awards" for his positive behavior at school.  (Doc. 16-4 at 7; Doc. 27-10 at 120–24, 157–58).  However, at the October 21st meeting, members of the IEP team discussed considerable behavioral issues with the parents for the first time.[2]  (Doc. 27-5 at 84, 96).  The Individualized Education Program noted that B.B. exhibited "inappropriate" and "disruptive" behaviors and sometimes "displayed unsafe behaviors with other children" that required close supervision by adults.  (Id. at 84, 96).  Reported behaviors in the classroom setting included choking and hitting.  (Id. at 96).  Reported behaviors on the bus included slapping, hitting, spitting, not staying in his seat, and throwing his shoes out the window.  (Id.).  The October 21 IEP team determined B.B.'s behavioral problems prevented him from being able to ride the regular education bus and ordered Ms. Barbara Moseley, an educational diagnostician, to conduct a Functional Behavioral Assessment ("FBA").  (Doc. 16-4 at 7; Doc. 27-4 at 86–88; Doc. 27-5 at 93; Doc. 27-10 at 176; Doc. 27-11 at 214).

 Ms. Moseley performed the FBA following the October IEP meeting (Doc. 27-4 at 87–88; Doc. 27-11 at 208, 210) and then developed a Behavior Intervention

---

[2]
 The IEP held October 21, 2010 appears to be misdated as occurring on March 24, 2010 and is included in the administrative record in Doc. 27-5 from page 83 to page 96. The October 21, 2010 IEP is referred to as Doc. 6 in the Due Process Hearing (27-10 at 137–38). There are unique sentences from Doc. 6 that were read into the record during the administrative hearing. (Doc. 27-10 at 152–55). These sentences comprise a paragraph that is identical to the language on the mis-dated IEP in the record. (Doc. 27-5 at 84, 96). Furthermore, there was a different IEP document dated on March 24, 2010 with different language, and the date March 24, 2010 appears on the May 17, 2010 IEP in error and was corrected by hand on each page. (Id. at 70–82). Thus, it appears that the incorrect date was a clerical error and the document was the IEP discussed at the IEP meeting on October 21, 2010.

Plan ("BIP") to address B.B.'s conduct.  (Doc. 27-4 at 67–78, 84–88).  Another IEP meeting was convened on December 7, 2010 to discuss the BIP that would be put into place by CPSB for three weeks starting December 8, 2010.  (Doc. 27-4 at 80, 84–88; Doc. 27-10 at 176–77).  On December 10, 2010, the BIP was staffed and officially commenced.  (Doc. 27-4 at 100; Doc. 27-11 at 239).

Also on December 10, 2010, B.B.'s parents requested to see Ms. Moseley's notes from the FBA she conducted, verbally and in writing, because she was reported to have observed B.B. on a day he was absent from school, creating some doubt in their minds as to the FBA's accuracy.  (Doc. 27-4 at 110–11; Doc. 27-10 at 181–83).  B.B.'s father stated on the record that he did not trust the school district and was not confident they actually performed an assessment.  (Doc. 27-10 at 183).  On the same day, December 10, 2010, Ms. Moseley sent a letter to the parents explaining that the date on the report was incorrect, including a corrected copy of the BIP, and offering to go over the assessment with the parents on January 5, 2011.  (Doc. 27-4 at 89–99; Doc. 27-10 at 184; Doc. 27-11 at 216–17).  B.B.'s father would be working out of the country that day, so the meeting was rescheduled to occur after he returned home.  (Doc. 27-4 at 112–14; Doc. 27-10 at 184–85).

Plaintiffs also argue the BIP was improperly and unilaterally revised without an IEP meeting, but Defendant maintains that the BIP may have been "tweaked" so an IEP meeting was unnecessary.  (Doc. 28 at 11; Doc. 27-11 at 241–43).

**Spring 2011**

On January 7, 2011, Plaintiffs requested an FBA be conducted by an outside evaluator as an Independent Educational Evaluation ("IEE"). (Doc. 27-4 at 116). Counsel for CPSB responded via letter on January 19, 2011 explaining the district's IEE process. (Id. at 116-17). On January 26, 2011, CPSB approved Plaintiffs' request for an IEE funded by the district. (Id. at 118–20). The FBA was in fact conducted by Dr. Sherlyn Ezell Powell as an IEE. (Doc. 27-9 at 191–98).

The ALJ found and the parties stipulated that "[o]n at least one school day during January 2011, B.B. was partially disrobed on the special education school bus." (Doc. 16-4 at 2; Doc. 42 at 3; Doc. 27-10 at 263–65). Additionally, the ALJ determined, and the parties stipulated, that "[o]n another school day during January 2011, B.B. was completely disrobed on the special education school bus, exited the bus, and entered his home without wearing any clothing." (Doc. 16-4 at 2; Doc. 42 at 3; Doc. 27-10 at 265–67). Plaintiffs contend they have made repeated requests for records and subpoenas related to these undressing incidents, but they have been provided no such information from CPSB. (Doc. 27-10 at 266–67; Doc. 28 at 11 n.7).

On January 27, 2011, Plaintiffs were invited to a meeting with Mary Jo Williams, the interim Special Education Director, and they were under the impression that the purpose of the meeting was for Ms. Williams to meet B.B.'s parents. (Doc. 27-10 at 187). Plaintiffs allege the meeting's purpose was actually to change B.B.'s BIP in place on the bus without the required IEP meeting. (Id. at 191).

10

These events led to Plaintiffs' filing for the request for Due Process and ultimately this case in federal court. The issue that remains is whether B.B.'s ability to ride the regular education school bus is "compromised" without the training and support requested by Plaintiffs. (Doc. 28 at 13).

The ALJ found that CPSB failed to provide transportation in the least restrictive environment ("LRE") and the Court agrees. The ALJ determined that B.B. would be able to ride the regular education bus with a "bus buddy" and there is generous support for this conclusion in the record. B.B.'s father testified that B.B. did not have significant behavioral problems in the family car. (Doc. 27-10 at 74–76). Ms. Cindy Bass and Dr. Sherlyn Ezell Powell also testified that B.B. was capable of riding the regular education bus with a peer-aged, non-disabled "bus buddy." (Doc. 27-11 at 157; Doc. 27-12 at 109–10).

Ms. Bass had worked as a bus aide with handicapped children for CPSB for more than 22 years and she worked personally with B.B. for more than one year. (Doc. 27-11 at 135, 141–42). Based on this, Ms. Bass testified it was her opinion that B.B. could ride the regular education bus with support. (Id. at 157). Ms. Bass also opined that a child trained to sit next to B.B. as his special helper would help enable B.B. to ride the general education bus. (Id.). By way of support, she noted that on a few occasions in the past, she had not been able to work the entire route, and the bus driver did not have an aide to help him with the last special education students on the route. (Id. at 161). On those occasions, the bus driver had said he could handle B.B. (Id. at 161—62).

Dr. Powell is an Associate Professor at University of Louisiana at Monroe

and teaches classes in the Special Education field.  (Doc. 27-12 at 20–22; Doc. 27-8 at 44–69).  Dr. Powell is also an educational diagnostician and observed B.B. on the special education school bus on multiple occasions.  (Doc. 27-12 at 21, 39; Doc. 27-9 at 192).  At the Due Process Hearing, the ALJ permitted Dr. Powell to testify as an expert witness in the field of Special Education and Development Disabilities, as well as behavioral issues.  (Doc. 27-12 at 29, 38).  Dr. Powell opined that B.B. would be able to ride the regular education bus with a non-disabled peer to demonstrate appropriate behavior.  (Id. at 109).  Dr. Powell explained that this "bus buddy" is similar to a peer tutor on a bus and modeling proper behavior would help B.B. learn appropriate bus riding behaviors.  (Id. at 110).  In terms of training for the regular education bus driver, Dr. Powell said some training would assist the bus driver in reinforcing B.B.'s appropriate behavior, but she did not say such training was necessary.  (Id.).  Dr. Powell also gave her opinion that, based on her observations, B.B. did not need a BIP.  (Id. at 180–81).

Since the ALJ's determination that B.B. would be able to ride the regular education bus with a "bus buddy" has generous evidentiary support, the Court adopts this finding.  The Court is not persuaded that B.B.'s ability to ride the regular education bus is compromised without having the additional bus driver support and training requested by the Plaintiffs.

## V.  FAPE

The next issue is whether the CPSB provided B.B. with a free appropriate public education from February 2, 2010 to February 2, 2011, as mandated by IDEA.

Federal law requires all states receiving federal financial assistance under the IDEA to ensure that all children with disabilities are provided "a free appropriate public education."  20 U.S.C. § 1412(a)(1)(A).  A "free appropriate public education" (FAPE) is defined to mean:

> [S]pecial education and related services that– (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

Under the requirements of IDEA, "the FAPE must be tailored to the child's particular needs by means of an individual education program ('IEP'), which is a written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and when appropriate, the child himself."  Adam J., 328 F.3d at 808, citing 20 U.S.C. § 1414(d)(1)(B).  A free appropriate public education must provide a "basic floor of opportunity" to children with disabilities, consisting of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."  Rowley, 458 U.S. at 201.  Furthermore, a school need not "maximize" a student's potential, but is "to confer some educational benefit upon the handicapped child."  Id. at 200.  This educational benefit cannot be "de minimis," but rather "must be meaningful" and "likely to produce progress."  Cypress-Fairbanks, 118 F.3d at 248.

To determine whether the FAPE provided to an individual child meets the

13

requirements of IDEA, the Supreme Court announced a two-part test in Rowley:

> First, has the State complied with the procedures set forth in the Act?
> And second, is the individualized educational program developed
> through the Act's procedures reasonably calculated to enable the child
> to receive educational benefits? If these requirements are met, the State
> has complied with the obligations imposed by Congress and the courts
> can require no more.

458 U.S. at 206–07. Each part of the test will be discussed in turn below.

## A. Procedural Compliance

Procedural inadequacies can rise to the level of denying a child FAPE

under certain circumstances. According to 20 U.S.C. § 1415(f)(3)(E)(ii), which

addresses procedural issues under IDEA:

> a hearing officer may find that a child did not receive a free appropriate
> public education only if the procedural inadequacies—
> (I) impeded the child's right to a free appropriate public education;
> (II) significantly impeded the parents' opportunity to participate
> in the decisionmaking process regarding the provision of a free
> appropriate public education to the parents' child; or
> (III) caused a deprivation of educational benefits.

Louisiana state law also adopts this standard, nearly verbatim. La. Admin Code tit.

28, pt. XLIII, § 513(A)(2).

In the Fifth Circuit, a procedural defect regarding IDEA occurs when "(1) a

procedural violation of the IDEA produced substantive harm, or (2) [the] IEPs were

not reasonably calculated to provide an educational benefit." Adam J., 328 F.3d at

813. Even when a procedural defect exists, the party alleging the defect must

establish a "procedural deficiency result[ing] in a loss of educational opportunity or

infring[ing] on [the] parent's opportunity to participate in the IEP process." Id. at 812.

Here, Plaintiffs allege CPSB's failure to have a regular education teacher

14

present at IEP meetings resulted in a denial of FAPE.  (Doc. 28 at 15)[3].  The IDEA

requires that a regular education teacher be present at the formation of a child's IEP

"if the child is, or may be, participating in the regular education environment." 20

U.S.C. § 1414(d)(1)(B)(ii); 34 C.F.R. § 300.321(a)(2); see also La. Admin. Code tit. 28,

pt. XLIII, § 321(A)(2).  The Sixth Circuit explains:

> [t]he rationale for requiring the attendance of a regular education teacher is
> closely tied to Congress's 'least restrictive environment' mandate. The input
> provided by a regular education teacher is vitally important in considering the
> extent to which a disabled student may be integrated into a regular education
> classroom and how the student's individual needs might be met within that
> classroom.

Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 860 (6th Cir. 2004).  The IDEA

mandates that students be educated in the least restrictive environment and be

"mainstreamed ... to the maximum extent appropriate."  R.H., 607 F.3d at 1013.

In this case, the ALJ determined a regular education teacher was not present

at IEP meetings held on March 24, 2010 and May 17, 2010 and was not excused from

being present.  (Doc 16-4 at 6).  There is ample evidence in the administrative record

to support this finding and it is adopted by the Court.  (Doc. 27-5 at 69–71; Doc. 27-10

at 105).

The ALJ also found that although a regular education teacher did not attend

the meetings, this did not constitute a procedural violation *"per se"* and  Plaintiffs

"did not prove that the presence of the regular education teacher would have

---

[3]   Since this case is limited to whether CPSB failed to provide FAPE to B.B. between February
2, 2010 to February 2, 2011, the IEP meeting that occurred on April 21, 2009 is beyond the
boundaries of this complaint and will not be discussed.

changed the team's decision." (Doc. 16-4 at 14). However, the jurisprudence upon which the ALJ relied to reach this conclusion, K.L.A. v. Windham Southeast Supervisory Union, 54 IDELR 112 (2d Cir. 2010), is distinguishable from the situation with which we are faced. K.L.A. addresses a regular education teacher who was absent from a particular IEP meeting, but who had attended other IEP meetings that year. Therefore, the appellate court found no procedural violation had occurred.

In the matter before us, the IEP meeting mostly concerned B.B.'s participation in the general education environment, making the attendance of a general education teacher appropriate and required. Further, we have not found, nor have the parties provided, any Fifth Circuit jurisprudence adopting the standard enunciated in K.L.A.. Therefore, we defer to the plain language of the statute. Thus, this Court finds CPSB violated the IDEA by failing to include a general education teacher at the spring 2010 IEP meetings and by removing B.B. from all academic general education classes. However, a procedural error and "technical deviations" do not render an IEP to be invalid. Deal, 392 F.3d at 860. The question remains whether this procedural violation produced substantive harm or infringed upon the parents' opportunity to participate in the IEP meetings.

On February 2, 2010 and until the end of the 2009-2010 school year, B.B. was in Ms. Loretta Mitchell's first grade self-contained special education class. (Doc. 27-10 at 103). An annual review IEP meeting was held on March 24, 2010. (Doc. 27-5 at 70). The March 24, 2010 meeting was either continued or an additional IEP meeting was held on May 17, 2010. (Id. at 71). Prior to this meeting, B.B. was scheduled to be

16

in regular education classes for art/music and physical education. (Id. at 109).

Additionally, B.B. was to attend school activities with non-disabled peers including:

assemblies, meals, recess, library, and field trips. (Id. at 109).

During the meeting on May 17, 2010, the IEP team determined that B.B.

needed to be in special education classes only because "the team feels that [B.B.'s]

needs can be better met in a self-contained classroom." (Doc. 27-5 at 80).  The IEP

team also concluded that B.B. "gets distracted easily and the IEP team thinks he

needs the small group setting for the majority of the time." (Id. at 81).  Although B.B.

was no longer to be enrolled in regular education classes, he would still attend

school activities such as assemblies, meals, recess, library, and field trips with his

non-disabled peers. (Id. at 80).

B.B.'s parents attended the spring 2010 IEP meetings, and they were able to

participate fully in those meetings. (Doc. 27-5 at 70–71).  Both IEPs state that the

parents' concern was for B.B. to be involved in more "inclusion" settings.[4]  (Id.).

B.B.'s participation in regular education classes was changed during the meeting,

but, as noted above, no regular education teacher was present. (Doc. 16-4 at 6).

B.B.'s father testified he did not remember anyone discussing removing B.B. from all

general education classes during the meeting, and he did not realize B.B. would no

---

[4]

      While not defined in the IDEA, in the special education field, "inclusion" is placing a student
with disabilities into a regular education classroom with age-appropriate peers, while
working on his own IEP goals and not necessarily the general education curriculum. (Doc.
35 at 6).  In contrast, "mainstreaming" is placing a special education student in a regular
education classroom with the expectation that the student will complete the regular
education curriculum requirements with supplementary aids and services. (Doc. 35 at 6).

longer be participating in the regular education setting.  (Doc. 27-10 at 126–27).

Despite the absence of a regular education teacher, the spring 2010 IEP meetings resulted in B.B.'s removal from regular education art/music and physical education, and his placement in a more restrictive self-contained special education setting for all academic classes.  (Doc. 27-5 at 80).  The reason a regular education teacher is required to attend an IEP meeting is because his or her input is "vitally important in considering the extent to which a disabled student may be integrated into a regular education classroom and how the student's individual needs might be met within that classroom."  Deal, 392 F.3d at 860.  There is no guarantee B.B. would have been placed in limited general education classes had a regular education teacher been present. However, we find the lack of such a teacher did have an impact on the decision-making process and resulted in an educational loss for B.B., who could have been mainstreamed to the extent possible by participating in regular education classes for art/music and physical education.

Defendant contends Plaintiffs have failed to meet their burden of proving any educational deprivation.  (Doc. 34 at 19).  The Court disagrees.  The evidence in the record shows B.B. had no behavioral problems in the spring of 2010 that would make placement in a regular education class inappropriate.  (Doc. 27-5 at 72).  His IEPs list his strengths as "social play" and "interacting with other students."  (Id. at 70–71). The ALJ made a finding that Plaintiff's expert witness, Dr. Powell, did not observe any inappropriate behaviors from B.B. while he was eating lunch with his non-disabled peers, and the regular education teacher had positive statements about

18

B.B.'s participation at lunch.  (Doc. 16-4 at 11).  Furthermore, Dr. Powell testified she believed CPSB's procedural violations impeded B.B.'s FAPE and resulted in a loss of educational opportunity.  (Doc. 27-12 at 118).  Dr. Powell further opined that B.B. needs to be in a "language rich environment" to improve his communication and phonological awareness.  (Id.).  Typically developing students are valuable role models to model behavior and social skills for disabled children.  (Doc. 27-12 at 73). After being removed from all general education classes, B.B. experienced a loss of interaction with non-disabled peers, which resulted in a loss of educational opportunity for B.B.'s phonological awareness as well as behavioral and social skills.

Defendant also argues that testimony from Ms. Necie Barker, Principal of Jonesville Elementary School, showed B.B. interacted with non-disabled peers at recess as well as during "computer lab, physical education, library, and other opportunities made available to regular education students."  (Doc. 34 at 19; Doc. 27-12 at 83).  However, Ms. Barker also stated she was not certain B.B. attended regular education P.E. in 1st grade, and he did not attend regular education P.E. in the 2nd grade, because the spring 2010 IEP meeting determined that would be inappropriate. (Doc. 27-12 at 270–72).  Defendant's argument is not persuasive, because IDEA requires that B.B. be mainstreamed to the "maximum extent appropriate." Accordingly, even if B.B. did have *some* activities in a mainstreamed environment, B.B. was not mainstreamed to the maximum extent appropriate if regular education P.E., art, or music was appropriate for B.B.  The person whose opinion would be most meaningful to this assessment is a regular education teacher, but a regular education

teacher did not participate in the IEP team.  As Dr. Powell explained, general

education teachers know what is necessary for a student to be successful in a

general education setting.  (Doc. 27-12 at 74).

For the foregoing reasons, the Court finds CPSB's procedural violation resulted

in a loss of educational opportunity and the deprivation of educational benefits.

## B. Substantive Compliance

The second part of the <u>Rowley</u> inquiry is whether an IEP was reasonably

calculated to enable the child to receive educational benefits.  <u>Rowley</u>, 458 U.S. at

206–07.  In <u>Cypress-Fairbanks</u>, 118 F.3d at 253, the Fifth Circuit announced the

following four-factor test to determine whether an IEP is reasonably calculated to

provide meaningful benefit:  (1) the program is individualized on the basis of the

student's assessment and performance; (2) the program is administered in the least

restrictive environment; (3) the services are provided in a coordinated and

collaborative manner by the key "stakeholders"; and (4) positive academic and non-

academic benefits are demonstrated. <u>Id.</u>

### 1. Program is Individualized

First, we must consider whether the program is individualized on the basis of

the student's assessment and performance.  <u>Cypress-Fairbanks</u>, 118 F.3d at 253. The

ALJ found all of B.B.'s IEPs were properly individualized, and the Plaintiffs offered no

evidence to the contrary.  (Doc. 16-4 at 18).  From a thorough review of the

administrative record and filings in this case, the Court agrees with and adopts this

conclusion.

20

### 2. Least Restrictive Environment

Second, we must consider whether the program was "administered in the least restrictive environment." Cypress-Fairbanks, 118 F.3d at 253.  The IDEA expresses a strong preference for "mainstreaming":

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). Of course, this preference for mainstreaming handicapped children has its limits: "[W]hen education in a regular classroom cannot meet the handicapped child's unique needs, the presumption in favor of mainstreaming is overcome and the school need not place the child in regular education." Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1045 (5th Cir. 1989).

The Fifth Circuit has established a two-part test for determining local school officials' compliance with the mainstreaming requirement:

> First, we ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

Daniel R.R., 874 F.2d at 1048 (internal citations omitted).

We begin with the first prong.  Here, because of B.B.'s circumstances and developmental delays, his need for special education classes regarding academic

subjects is not in dispute.  B.B. is still at the pre-school level mentally, so sitting in a regular education 2nd grade class for reading would not be educationally beneficial to him.

It is the second prong—whether the handicapped child "has been mainstreamed to the maximum extent appropriate"—where the dispute between the parties arises.  The IDEA does not envision an "all-or-nothing" solution, in which handicapped children are either "mainstreamed" in a regular education environment or placed in a special education system. Daniel R.R., 874 F.2d at 1050. Instead, the Act and the jurisprudence "require schools to offer a continuum of services." Id. (internal citations omitted). Accordingly, local school officials must take "intermediate steps" where necessary, such as "placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only, or providing interaction with nonhandicapped children during lunch and recess." Id. The appropriate solutions or mix of solutions will depend on the particular child and may likewise vary each school year as the child advances.  Id.

Plaintiffs contend B.B. should have been able to take non-academic classes like physical education and art/music with non-disabled peers, and that excluding him from these classes resulted in a lost educational opportunity. (Doc. 28 at 17–19). Defendant argues the Court should defer to the educational policy choices made by B.B.'s IEP team. (Doc. 29 at 19).  However, as mentioned *supra*, the IEP team at issue did not include a regular education teacher.  Without such a teacher, the team failed

to demonstrate B.B.'s inability to participate in non-academic general education classes.  Even if an IEP team had validly decided B.B. could not benefit from non-academic regular education classes, B.B. should have been given the opportunity to interact with non-disabled peers during lunch.  B.B.'s mother testified the child did not eat lunch with non-disabled peers until November 2010. Prior to that date, he ate with the special education students at 10:15 a.m. while the regular education students ate at noon.  (Doc. 27-10 at 247–48).  Thus, deference to the IEP team regarding this decision is unwarranted and this Court finds that B.B. was not mainstreamed to the maximum extent appropriate.

### 3. Services are Provided in a Coordinated and Collaborative Manner

Third, coordination and collaboration from key stakeholders requires a showing of more than a *de minimis* failure to implement the disabled child's IEP. Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir. 2000). Courts generally find coordination and collaboration exists if significant provisions of an IEP are implemented and followed.  Id. at 348–49.  Significant provisions are determined in part based on whether the IEP services that were provided actually conferred an educational benefit. Id. at 349 n.2. In Bobby R., the court discussed how to identify a "significant provisions":

> determination of what are "significant" provisions of an IEP cannot be made from an exclusively *ex ante* perspective. Thus, one factor to consider under an *ex post* analysis would be whether the IEP services that were provided actually conferred an educational benefit.

200 F.3d at 349 n.2.

23

Coordination and collaboration requires participants to communicate outside of IEP meetings to ensure the child's needs are met. Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P., 582 F.3d 576, 587 (5th Cir. 2009). It also requires key stakeholders to receive adequate training in order to implement the IEP properly. Id. at 588.

The extent of B.B.'s participation in activities at school with non-disabled peers is muddy in the record.  Plaintiffs contend B.B. did not participate in regular education classes as required by his IEP in spring 2010 including P.E. and art/music. Principal Barker testified she was not sure if B.B. actually took part in regular education P.E. in the spring of 2010 when he was in the 1st grade.  (Doc. 27-12 at 270–72).  B.B.'s father said no one ever spoke to him about the child's participation in regular P.E.  (Doc. 27-10 at 103–04). Barbara Moseley stated she did not know if B.B. was in regular P.E. class or not.  (Doc. 27-11 at 221).  If B.B. was not in the classes assigned to him on his IEP, including regular education P.E., then that would be a failure of the school to coordinate and collaborate.  However, the evidence on this point is unclear.  Plaintiffs provided no evidence that unequivocally showed B.B. did not participate in regular education classes in the 1st grade.  Therefore, Plaintiffs did not meet their burden to prove the school failed to coordinate and collaborate the implementation of B.B.'s IEP.

### 4. Positive Academic and Non-Academic Benefits are Demonstrated

It is not necessary for a child to improve in every area to receive an educational benefit; rather, a child's improvement must be more than trivial.  Bobby R., 200 F.3d 341 at 349–50.

> [A] disabled child's development should be measured not by his relation to the rest of the class, but rather with respect to the individual student, as declining

24

percentile scores do not necessarily represent a lack of educational benefit, but only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers.

Id. at 349. IDEA does not require a program to maximize a disabled child's potential. R.H., 607 F.3d at 1015. "[T]he educational benefit cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." Richardson Indep. Sch. Dist. v. Michael Z, 580 F.3d 286, 292 (5th Cir. 2009) (internal quotations omitted). As long as the child is provided with a basic floor opportunity, including services specifically designed to benefit the child, the district has fulfilled its legal obligation. RH., 607 F.3d at 1015.

The ALJ found Plaintiffs failed to prove B.B. did not achieve positive academic and non-academic benefits. (Doc. 16-4 at 21–22). The ALJ, who emphasized that IDEA does not create a maximizing standard, stated B.B.'s progress was tracked on progress reports, report cards, and IEPs. (Id.). After reviewing the records, the Court finds ample evidence that B.B. did make advancements. Dr. Powell testified B.B. had achieved "some" progress, though she felt the progress was "*de minimis*." (Doc. 27-12 at 217–19). B.B.'s educational level was significantly delayed, and at the time of the Due Process Hearing when B.B. was 7 years old, he had a mental age of between 3 and 4 years. (Id. at 48). From a review of the record, B.B. improved his toiletting skills, which is a critical step to helping him become more independent. (Doc. 27-8 at 35). In terms of communication, B.B. was using two or three word sentences in May 2010, and had improved by using a four word sentence to communicate with his teacher. (Compare Doc. 27-5 at 74 with Doc. 27-9 at 79). Thus, the Court finds B.B. was given a basic floor of opportunity including services like speech to benefit him

25

individually.  Additionally, we find he made some academic and non-academic

progress.

Overall, an application of the <u>Rowley</u> analysis to the circumstances before us,

shows Defendant made procedural errors by failing to have a regular education

teacher attend consecutive IEP meetings and by deciding to withdraw B.B. from

general education classes completely.  These errors caused substantial harm and

loss of educational opportunity to the child and resulted in the denial of a free

appropriate public education under IDEA.

## VI.  "Spatting" Incident

Additionally, Plaintiffs claim the lack of coordination and collaboration among

the CPSB stakeholders regarding B.B.'s education led the parties to this litigation.

(Doc. 33 at 2).  Plaintiffs specifically cite the "spatting" incident involving a

substitute teacher as evidence that CPSB lacked coordination and collaboration with

respect to B.B.'s education.  (Doc. 33 at 3–5).

B.B.'s substitute teacher, Denise Huffman, confessed to B.B.'s mother  that on

January 27, 2011, Ms. Huffman "spatted" the child in class.[5]  (Doc. 27-10 at 192–96;

Doc. 27-10 at 268–71; Doc. 27-11 at 106; Doc. 27-12 at 251).  B.B.'s parents had heard

B.B. say "girl hit" on the evening of January 27, 2011 but assumed a child at school

hit him.  (Doc. 27-10 at 192, 268).  Plaintiffs contend that on January 28, 2011, Ms.

Huffman told Ms. Beard in person that she "slapped" B.B. the day before.  (Doc. 27-10

---

[5]     "Spatting" is a term used by both Plaintiffs and Defendant to describe a touching that
seems to be lighter than a "slap."  Plaintiffs contend B.B. was "slapped" by Ms. Huffman,
but Defendant claims Ms. Huffman "spatted" B.B. on the arm.  (Doc. 27-12 at 256).  B.B.'s
father defined "spat" as a "pop... on the butt with [his] hand."  (Doc. 27-10 at 81).  Although
on rare occasions the father "spats" B.B. as a disciplinary measure, he does not condone
someone outside the home "spatting" his child.  (Id. at 81–82).

at 192, 269).  Mr. Beard purported to address the matter by calling Mary Jo Williams, Special Education Director, on the phone.  (Doc. 27-10 at 192, 270).  Ms. Williams reported the incident to Dr. Gwile Freeman, Superintendent of Catahoula Parish School District, and Dr. Freeman relayed the information to Sheriff James Kelly.  (Doc. 27-11 at 106).  That weekend, Ms. Huffman phoned Ms. Beard to apologize and to say she had been fired for "spatting" B.B.  (Doc. 27-10 at 195–96; 270–71).  The next Monday, Ms. Williams informed Mr. and Mrs. Beard that Ms. Huffman had been fired. (Doc. 27-10 at 271; Doc. 27-11 at 126–27).  Dr. Freeman testified that as soon as she became aware of the incident, she made sure Ms. Huffman would no longer substitute for the school district.  (Doc. 27-11 at 129).  Plaintiffs allege CPSB failed to send the parents any information about the incident or the district's investigation. (Doc. 27-10 at 194–95, 271; Doc. 27-11 106–07; Doc. 27-12 at 251).

While the "spatting" incident was unfortunate and Ms. Huffman's conduct unacceptable, the Court finds that it was an isolated incident involving a single teacher and the school district reacted promptly and appropriately.  The matter was reported to the authorities without delay and Ms. Huffman was permanently removed as a substitute teacher for the district.  Thus, the Court is not persuaded that this single event is evidence CPSB lacked coordination and collaboration with respect to B.B.'s education.

## VII. Remedy

When the conflicts discussed above arose, B.B. was 7 years old and was attending the 2nd grade at Jonesville Elementary School.  At the time of this writing, B.B. is 10 years old and entered the 5th grade in the fall of 2013 at Jonesville Junior

High School. (Doc. 44 at 2). With the significant passage of time, and primarily because of B.B.'s absence from school, any evidence of B.B.'s abilities in the record is stale, and the Court declines to fashion a remedy at this point.[6] Rather, the Court defers to B.B.'s IEP team to determine compensatory education for the denial of FAPE we have identified. In the same vein, while the Court affirms the ALJ's holding that CPSB failed to provide transportation to B.B. in the least restrictive environment, the Court defers to the IEP team's judgment to decide whether a "bus buddy" is still appropriate to enable B.B. to ride the regular education bus.

### VIII. Prevailing Party Status

A party must be a 'prevailing party' to be eligible for an award of attorney's fees under the IDEA. Gary G. V. El Paso Indep. Sch. Dist., 632 F.3d 201, 208 (5th Cir. 2011). A prevailing party must attain a remedy that: "(1) alters the legal relationship between the school district and the handicapped child and (2) fosters the purposes of the IDEA." El Paso Indep. Sch. Dist. v. Richard R., 591 F.3d 417, 421–22 (5th Cir. 2009). To determine whether a party qualifies as a prevailing party, the Fifth Circuit has adopted the following test: "a prevailing party is one that has obtained a judgment on the merits, a consent decree, or some form of judicially sanctioned relief." Id. at 422. In short, "the litigant must attain some judicial imprimatur on a material alteration of the legal relationship in order to be a prevailing party." Id.

---

[6] A further impediment to fashioning a remedy is superimposed on the Court because during oral argument on November 26, 2012, the Court was first advised that B.B. was currently and had been on Homebound for an extended period of many months. Plaintiffs removed B.B. from Jonesville Elementary School and placed him on Homebound after he broke his leg and Defendant contends that Plaintiffs elected to keep B.B. home, and consequently there was no opportunity for CPSB to enable B.B. to ride the regular education bus.

The Court finds that Plaintiffs received a remedy granting them prevailing party status.  As for attorney's fees, these will be considered based upon a complete presentation of the lodestar and additional briefing by the parties, including the effect of the settlement offer made at the ALJ level.  See <u>El Paso Indep. Sch. Dist. v.</u> <u>Richard R.</u>, 591 F.3d 417 (5th Cir. 2009).

## IX. Conclusion

For the reasons detailed above, Plaintiffs' Motion for Summary Judgment (Doc. 28) and Defendant's Motion for Summary Judgment (Doc. 29) will be GRANTED IN PART and DENIED IN PART and judgment will be rendered as follows:

(1)   The Administrative Law Judge correctly determined Defendant failed to provide B.B. with transportation in the least restrictive environment, but the additional bus driver support and training sought by Plaintiffs is not required;

(2)   Defendant failed to provide B.B. with a free appropriate public education ("FAPE") between February 2, 2010 and February 2, 2011 secondary to procedural errors, but not secondary to substantive errors;

(3)   The Court defers to B.B.'s current IEP team to determine what compensatory education, if any, is appropriate to redress these errors;

(4)   The "spatting" incident did not constitute a lack of coordination and collaboration with respect to B.B.'s education; and

(5)   Plaintiffs are determined to be "prevailing parties" regarding numbers (1) and (2) above, but attorney's fees and costs are not herein awarded.

SIGNED on this ___ day of October, 2013 at Alexandria, Louisiana.

DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

29